FILED
UNITED STATES DISTRICT COURT ὃ CLERKS OFFICE
DISTRICT OF MASSACHUSETTS

2005 OCT 25  P 12: 35

```
                                    )
BAHIG F. BISHAY,                    )
         Plaintiff                  )                   DISTRICT COURT
         v.                         )         Civil Action DISTRICT OF MASS.
                                    )         No. 05-10451-RGS
CITIZENS BANK OF MASSACHUSETTS, )
         Defendant                  )
_____)
```

## PLAINTIFF'S MOTION FOR RECONSIDERATION

Now comes Plaintiff Bahig Bishay (hereafter "Bishay"), and respectfully requests this

Honorable Court to reconsider its Decision & Order dated October 11, 2005, because Bishay

believes this Court appears to have rushed its Decision to dismiss Bishay's recent breach of

contract claim without the benefit of ascertaining the relevant additional facts listed herein.

Bishay respectfully points out that in the interest of truly *manifested justice;* to preserve

the *constitutional & contractual rights* of Chapter 11 re-organized debtors, such as Bishay in this

case; and in the interest of *Public Policy* - Bishay urges this Honorable Court to spare Bishay

from such unfair trend which was clearly exhibited in various related proceedings during this ten

year ordeal of *Citizens v. Bishay* and *Bishay v. Citizens.* Simply stated: *nailing the coffin* shut at

this juncture, as this Court almost did, would result in a judicial travesty, indeed.

As a threshold matter, it was regrettable that this Court saw fit to cancel the previously

scheduled hearing; advised Bishay that due to a "*judicial emergency*" the Court was going to set

a new hearing date; but within a couple of weeks Bishay received 6-page Decision dismissing his

bona-fide breach of contract claim, without the benefit of a hearing.

Notwithstanding the foregoing, and to *prevent manifest injustice*, however, Bishay brings

the following relevant facts to this Court's attention, and prays that this Court will now

reconsider its recent dismissal of Bishay's present breach of contract claim:

1. Citizens Bank (hereafter "Citizens") should not be permitted (based on ample *Breach*

   *of Contract, Preclusion and Collateral Estoppel* case-law[1] available to this Court) to

---

[1] See, for example, and this Court certainly has the required resources to do more comprehensive search in this area of the law: *Washington Public Power Supply System*, Plaintiff-Appellant, v. *Pittsburg-Des Moines Corp.; The American Insurance Company*, Defendants Appellees. No. 91-35669 United States Court Of Appeals For The Ninth Circuit. A district court's grant of summary judgment and its interpretation of state law is reviewed de novo. PDM I, 876 F.2d at 692. "In order to affirm a grant of summary judgment, a reviewing court must be satisfied that no genuine issues of material fact remain and that the moving party is entitled to judgment as a matter of law." Hernandez v. City of Los Angeles, 624 F.2d 935, 937 (9th Cir. 1980). All evidence must be considered in a light most favorable to the non-moving party. Id.

This is a diversity case between a Washington plaintiff and Pennsylvania and New Jersey defendants. The parties have agreed the contract shall be construed and interpreted in accordance with the laws of the State of Washington.

A. COLLATERAL ESTOPPEL

The first issue raised in this appeal is whether the district court properly applied the rules of collateral estoppel when it found that the prior jury verdict estopped WPPSS from claiming contract 213A governs the breach of contract claims.

Collateral estoppel, or issue preclusion, bars the relitigation of issues actually adjudicated in previous litigation between the same parties." Clark v. Bear Stearns & Co., Inc., 966 F.2d 1318, 1320 (9th Cir. 1992). In this case, Contract 213A permits WPPSS to claim consequential damages for a breach of contract cause of action whereas the availability of consequential damages under 213B is unclear. Other remedies would be de minimus under the facts of the case. Thus, the district court's application of collateral estoppel crucially affects WPPSS's entire cause of action by limiting the possible amount of recovery.

In reviewing the district court's decision, we must first consider the applicable estoppel law in a diversity case. The Ninth Circuit holds that a federal court sitting in diversity must apply the forum state's rule of collateral estoppel when, as in the present case, the issue had been previously resolved by a federal court sitting in diversity. Bates v. Union Oil Co. of California, 944 F.2d 647, 649 (9th Cir. 1991), cert. denied, 112 S. Ct. 1761 (1992). The parties have agreed to regard Washington as the forum state. Under the law of Washington, collateral estoppel in a diversity case is governed by federal law. Alcantara v. Boeing Co., 705 P.2d 1222, 1225 (Wash. App. 1985). Therefore, we turn to federal law to determine the preclusive effect of the jury's verdict.

Whether collateral estoppel is available is a mixed question of law and fact subject to de novo review. Plaine v. McCabe, 797 F.2d 713, 718 (9th Cir. 1986). Once the availability of collateral estoppel is determined, a district court's decision to apply collateral estoppel is reviewed for abuse of discretion. Id.

Under the federal standard, to foreclose relitigation of an issue under collateral estoppel, the following three elements must be met:

FILED
UNITED STATES DISTRICT COURT CLERKS OFFICE
DISTRICT OF MASSACHUSETTS

2005 OCT 25  P 12: 35

BAHIG F. BISHAY, )
    Plaintiff )
    v. )
    )
CITIZENS BANK OF MASSACHUSETTS, )
    Defendant )
    )

U. S. DISTRICT COURT
DISTRICT OF HASS.
Civil Action
No. 05-10451-RGS

## PLAINTIFF'S MOTION FOR RECONSIDERATION

Now comes Plaintiff Bahig Bishay (hereafter "Bishay"), and respectfully requests this Honorable Court to reconsider its Decision & Order dated October 11, 2005, because Bishay believes this Court appears to have rushed its Decision to dismiss Bishay's recent breach of contract claim without the benefit of ascertaining the relevant additional facts listed herein.

Bishay respectfully points out that in the interest of truly *manifested justice;* to preserve the *constitutional & contractual rights* of Chapter 11 re-organized debtors, such as Bishay in this case; and in the interest of *Public Policy* - Bishay urges this Honorable Court to spare Bishay from such unfair trend which was clearly exhibited in various related proceedings during this ten year ordeal of *Citizens v. Bishay* and *Bishay v. Citizens.* Simply stated: *nailing the coffin* shut at this juncture, as this Court almost did, would result in a judicial travesty, indeed.

As a threshold matter, it was regrettable that this Court saw fit to cancel the previously scheduled hearing; advised Bishay that due to a "*judicial emergency*" the Court was going to set a new hearing date; but within a couple of weeks Bishay received 6-page Decision dismissing his bona-fide breach of contract claim, without the benefit of a hearing.

Notwithstanding the foregoing, and to *prevent manifest injustice*, however, Bishay brings

the following relevant facts to this Court's attention, and prays that this Court will now

reconsider its recent dismissal of Bishay's present breach of contract claim:

    1.  Citizens Bank (hereafter "Citizens") should not be permitted (based on ample *Breach*

        *of Contract, Preclusion and Collateral Estoppel* case-law[1] available to this Court) to

---

[1] See, for example, and this Court certainly has the required resources to do more comprehensive search in this area of the law: *Washington Public Power Supply System*, Plaintiff-Appellant, v. *Pittsburg-Des Moines Corp.; The American Insurance Company*, Defendants Appellees. No. 91-35669 United States Court Of Appeals For The Ninth Circuit. A district court's grant of summary judgment and its interpretation of state law is reviewed de novo. PDM I, 876 F.2d at 692. "In order to affirm a grant of summary judgment, a reviewing court must be satisfied that no genuine issues of material fact remain and that the moving party is entitled to judgment as a matter of law." Hernandez v. City of Los Angeles, 624 F.2d 935, 937 (9th Cir. 1980). All evidence must be considered in a light most favorable to the non-moving party. Id.

This is a diversity case between a Washington plaintiff and Pennsylvania and New Jersey defendants. The parties have agreed the contract shall be construed and interpreted in accordance with the laws of the State of Washington.

A. COLLATERAL ESTOPPEL

The first issue raised in this appeal is whether the district court properly applied the rules of collateral estoppel when it found that the prior jury verdict estopped WPPSS from claiming contract 213A governs the breach of contract claims.

Collateral estoppel, or issue preclusion, bars the relitigation of issues actually adjudicated in previous litigation between the same parties." Clark v. Bear Stearns & Co., Inc., 966 F.2d 1318, 1320 (9th Cir. 1992). In this case, Contract 213A permits WPPSS to claim consequential damages for a breach of contract cause of action whereas the availability of consequential damages under 213B is unclear. Other remedies would be de minimus under the facts of the case. Thus, the district court's application of collateral estoppel crucially affects WPPSS's entire cause of action by limiting the possible amount of recovery.

In reviewing the district court's decision, we must first consider the applicable estoppel law in a diversity case. The Ninth Circuit holds that a federal court sitting in diversity must apply the forum state's rule of collateral estoppel when, as in the present case, the issue had been previously resolved by a federal court sitting in diversity. Bates v. Union Oil Co. of California, 944 F.2d 647, 649 (9th Cir. 1991), cert. denied, 112 S. Ct. 1761 (1992). The parties have agreed to regard Washington as the forum state. Under the law of Washington, collateral estoppel in a diversity case is governed by federal law. Alcantara v. Boeing Co., 705 P.2d 1222, 1225 (Wash. App. 1985). Therefore, we turn to federal law to determine the preclusive effect of the jury's verdict.

Whether collateral estoppel is available is a mixed question of law and fact subject to de novo review. Plaine v. McCabe, 797 F.2d 713, 718 (9th Cir. 1986). Once the availability of collateral estoppel is determined, a district court's decision to apply collateral estoppel is reviewed for abuse of discretion. Id.

Under the federal standard, to foreclose relitigation of an issue under collateral estoppel, the following three elements must be met:

(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

Bear Stearns, 966 F.2d at 1320 (emphasis added). None of these elements is met in the present case.

1. Identity of Issues

The party asserting estoppel bears the burden of pleading and proving the identity of issues decided in the previous action." Little v. United States, 794 F.2d 484, 487 (9th Cir. 1986). To sustain this burden, PDM "'must introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action.'" Id. (quoting Davis & Cox v. Summa Corp., 751 F.2d 1507, 1518 (9th Cir. 1985) (emphasis added).

Similarity between issues is not sufficient; collateral estoppel is applied only when the issues are identical." Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 408 (9th Cir. 1985) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979)) (emphasis added); accord Little, 794 F.2d at 487; Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1357 (9th Cir. 1985). The Ninth Circuit has strictly applied the identity requirement. See, e.g., Shapley, 766 F.2d at 408 (holding that issue of whether prison doctors were liable for deliberate medical indifference was not identical where the second claim involved a different incident); Little, 794 F.2d at 487 (holding the issue of whether to nullify a first trust deed foreclosure sale is not identical to the issue of whether the government's tendered redemption under a second trust deed was adequate reimbursement); Levi Strauss, 778 F.2d at 1357 (holding the issue of whether a pants pocket tab has secondary meaning within the Lanham Trade-Mark Act is not identical to the issue of whether a shirt pocket tab has secondary meaning within the Act); Bear Stearns, 966 F.2d at 1323 (holding a state common law negligence and fraud claim is not identical to a federal 10b-5 claim under the Securities Exchange Act); Clark v. Watchie, 513 F.2d 994, 998-1000 (9th Cir.) (holding a state breach of fiduciary duty claim is not identical to a federal 10b-5 claim), cert. denied, 423 U.S. 841 (1975).

In the present case, the issues are not identical because the 1986 trial was limited to warranty interpretation issues, not breach of contract issues. PDM presents no argument whatsoever that the two issues are identical, thus failing to meet its burden of presenting a record and pinpointing the litigated issues with exactitude.

The district court's affirmation of identity of issues was based principally on its finding that there was "a substantial overlap of evidence and argument" between the two cases. However, federal law does not regard the "substantial overlap of evidence and argument" factor to be determinative in an identity of issue analysis, particularly where different facts are at issue. See, e.g., Levi Strauss 778 F.2d at 1357 (holding that an offer of different evidence in the second case would not invoke collateral estoppel where different facts were at issue in the cases). Here, the evidence in the first case was offered to prove or disprove warranty provisions in the contracts, while the evidence in the second case, whether the same or not, will be offered to prove or disprove breach of contract provisions. No federal case stands for the proposition that identical evidence renders the issues identical.

The overlap of evidence factor has been considered in res judicata analysis. See Bear Stearns, 966 F.2d at 1320; Shapley, 766 F.2d at 406. However, we have found no federal collateral estoppel case which has applied this factor. But see Starker v. United States, 602 F.2d 1341 (9th Cir. 1979) (overlap of evidence factor is listed generally in collateral estoppel context, but not a consideration in the court's decision).

Moreover, even if such a factor were considered, it also fails because the evidence in the two cases does not overlap. WPPSS plans to introduce additional evidence about the extent of PDM's breach prior to Mod. 164, beyond discussions and perceptions which occurred during Mod. 164 negotiations, which is relevant to the question of whether WPPSS intended to reserve a breach of contract claim. In sum, the

3

hide behind a decision of a state court judge, to absolve itself from *specific*

*performance* stemming from contractual obligations Citizens freely accepted when it

demanded that Bishay set in escrow $500,000 for the sole purpose of "prosecuting"

his claims against Citizens (hereafter the "Claims"), without limitations, (the very

claims Citizens deceptively led the state court judge to believe they were already

settled, and otherwise extinguished during the bankruptcy proceedings), and as it

---

identity of issues element has not been met.

2. Actually Litigated

PDM must show that the breach of contract issue was "'actually decided' after [WPPSS had] a 'full and fair opportunity' for litigation." Robi v. Five Platters, Inc., 838 F.2d 318, 322 (9th Cir. 1988) (citation omitted). Collateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding." Eureka Federal Sav. & Loan v. Amer. Cas. Co. of Reading, Pa., 873 F.2d 229, 233 (9th Cir. 1989) (emphasis added).

It is undisputed that the district court expressly removed WPPSS's contract claims from jury consideration when it granted the motion for summary judgment in 1986. Therefore, PDM fails to prove the breach of contract issue was actually litigated.

3. Issue was Critical and Necessary to Prior Decision

An issue may not be relitigated if the determination of the issue was critical and necessary to the judgment reached in the prior litigation. Bear Stearns, 966 F.2d at 1320; accord Segal v. American Tel. & Tel. Co., 606 F.2d 842, 845 n.2 (9th Cir. 1979). The burden is upon PDM to show with "clarity and certainty" that the breach of contract issue was "necessarily decided" by the jury. United States v. Richard, 892 F.2d 761, 763 (9th Cir. 1989); Bear Stearns, 966 F.2d at 1321.

PDM asserts the jury's decision that 213B governs warrant claims implies the jury "necessarily decided" that 213B governs contract claims as well.

"Necessary inferences from the judgment, pleadings and evidence will be given preclusive effect. But if there is doubt, collateral estoppel will not be applied, especially if the previous decision could have been rationally grounded on an issue other than that which the defendant seeks to foreclose from consideration." Little, 794 F.2d at 487 (citations omitted); accord Davis & Cox, 751 F.2d at 1518. Therefore, we "must determine whether the jury could have grounded its 'verdict' upon any other issue." Pettaway v. Plummer, 943 F.2d 1041, 1044 (9th Cir. 1991) (citing Ashe v. Swenson, 397 U.S. 436, 444 (1970)), cert. denied, 113 S. Ct. 296 (1992).

In the present case, the jury could have reached its decision about reserved warranty claims without necessarily having reached a decision about the reserved breach of contract claims, as follows. Paragraph two of Mod. 164 reserves claims for issues between WPPSS and PDM "that may arise from [PDM's] failure to properly implement the [QA Program] as set forth in the 2808-213A by reference herein as applicable to this issue." Mod. 164, P 2 (emphasis added). The reference to Contract 213A in paragraph two could be interpreted to mean that the parties intended that 213A govern all reserved claims.

inappropriately advanced the res judicata argument relied upon by the state court judge.

2. Citizens should not be permitted to absolve itself from the *specific performance* stemming from contractual obligations Citizens freely accepted, just because it got away with deceptively luring a state court judge to believe that Bishay's claims had been extinguished in the Bankruptcy Court, when Citizens specifically knew they were not. To this end, in his Memorandum of Decision and Order dated December 1, 1997, the state court judge wrote:

> *"Citizens first contends that it is entitled to judgment as a matter of law on the ground that most of Bishay's counterclaims are precluded by the Bankruptcy Court's April 23, 1996 Confirmation Order. The doctrine of prior adjudication has two aspects. Res judicata, or claim preclusion, dictates that a valid and final judgment rendered by a court of competent jurisdiction bars relitigation between the same parties of any claim that was or might have been raised with respect to the subject matter of the prior litigation ..."* [emphasis added].

3. In 1997, Citizens Cleary knew that Bishay's claims were neither settled nor extinguished in the Bankruptcy Court, yet Citizens stood before the state court judge and falsely led him to believe that Bishay's claims were already settled and otherwise extinguished. Annexed hereto as Exhibit-1, is the first Chapter 11 Plan Proposed By Citizens Bank of Massachusetts, and dated January 10, 1996. In that Plan (otherwise known as "contract" in these proceedings), Citizens wrote:

> *"Entry of the Confirmation Order shall (i) constitute confirmation of the allowance of the Citizens Claim in the amount, as of September 19, 1995, in the principal amount of $1,582,315.11, less any amounts paid to Citizens against that Claim from the Debtors or Debtors' estate since that date, plus late fees in the amount of $4,289.91, plus prepetion fees, expenses and costs of collection, plus accrued prepetion interest in the amount of $26,795.21, plus (to the extent allowed by the Court pursuant to Code Section*

5

*506(b), for which Citizens may apply at any time before or after entry of the Confirmation Order) postpetion interest and charges arising under the loan documents between the Debtors and Citizens, including Citizens' postpetion attorneys' fees and other costs of collection, <u>less the $10.00 release payment by Citizens, (ii) confirm that there are no offsets, counterclaims or defenses to Citizens' Claim or the validity, enforceability or perfection of its liens on any of the Estate Assets, and (iii) release Citizens from any claims, demands, obligations, liabilities and cause of action of whatever kind or nature, whether known or unknown, which the Debtors or any entity owned or controlled by Mr. Bishay has, may have, or might assert now or in the future against Citizens Bank and/or its affiliates, participants, officers, directors, employees, agents, attorneys, accountants, consultants, successors and assigns, directly or indirectly, arising out of, based upon, or in any manner connected with the Citizens Claim. In exchange for the release, Citizens shall (i) pay to the Debtors the sum of $10.00.</u>"*

4. In 1997, and when Citizens' attorneys stood before the state court judge, they knew

   that the January 10, 1996 Proposed Plan was, specifically, rejected by the Bankruptcy

   Court, and was, specifically, amended and later approved by the Bankruptcy Court,

   but only after Citizens agreed to substitute its demand for a *"10.00 release"*

   previously included in the January 10, 1996 Proposed Plan, with the following

   language, which is reflected in the Second Modification To Chapter 11 Plan Proposed

   By Citizens Bank of Massachusetts, dated April 23, 1996, and approved by the

   Bankruptcy Court, which is annexed hereto as Exhibit-2:

   *"The Debtors' estate <u>may retain</u> and, by its duly authorized <u>representative(s) settle, release or prosecute, their alleged claims against Citizens arising from the transactions</u> between the <u>Debtors</u> and <u>Citizens and related matters</u> (the "Alleged Claims"). However, the Alleged Claims, until and unless reduced by Final Order to a judgment against Citizens, shall not reduce, delay or otherwise interfere with the timely and satisfaction of Citizens' Class One Claim in accordance with this Plan. <u>In addition, until Citizens' actually receives (in form and substance reasonably acceptable to it) a release from (and evidence of dismissal with prejudice of) all Alleged Claims,</u> Citizens shall retain its lien on all Estate Assets not disposed of in accordance with this Plan as*

6

*security for Citizens' contractual right to reimbursement from the Debtors for Citizens' costs and anticipated costs of defending the Alleged Claim; provided, however, (a) that the Debtors may obtain the discharge of such liens within (30) days after the date on which the Class One Claim has been paid in full (but in no event later than January 31, 1997, by delivering to Citizens (i) an irrevocable letter of credit (in form and substance reasonably acceptable by Citizens) issued for the benefit of Citizens by a reputable domestic commercial bank in the amount of $500,000 subject to being drawn by Citizens by presentation of a sworn statement that a court of competent jurisdiction has determined that Citizens has the right to recover costs or expenses (including, without limitations, attorneys' fees or expenses) incurred in connection with defense of the Alleged Claims in an amount equal to or greater than the amount of such draw, or (ii) a bond (in form and substance reasonably acceptable to Citizens) issued for the benefit of Citizens by a reputable domestic bonding or insurance company securing such possible right of recovery up to a sum of not less that $500,000 ... At any time, the Debtor or the Consummation Agent may settle the Alleged Claims, subject to Court approval after notice to the Debtors and other parties in interest.*"
[Emphasis added]

5. In 1997, and when Citizens' attorneys stood before the state court judge, they knew

that one year earlier (specifically, July 31, 1996), and following the Bankruptcy

Court's approval of the Amended Plan after Citizens agreed to delete the reference to

the *"$10.00 release"* and, instead, inserted the language reflected in the April 23,

1996 Confirmed Plan (see paragraphs 3 & 4 above), Citizens knew that Bishay was

specifically appointed by the Bankruptcy Court to proceed with the "prosecution" of

the subject Claims, in conjunction with which Bishay placed in escrow $500,000 in

cash. Citizens was clearly aware of the following Order of the Bankruptcy Court

dated July 31, 1996, which is annexed hereto as Exhibit-3:

*" Bahig F. Bishay ("Bishay"), 1095 Commonwealth Avenue Corp. ("CAC") (collectively, the Debtors") and David J. Ferrari, the Consummation Agent in these proceedings (the "Consummation Agent") respectfully request this Court to enter an order appointing Bishay as the representative of both estates to pursue*

7

*litigation pending in the Suffolk Superior Court commenced by Citizens Bank of Massachusetts ("Citizen"). The Movants also request this Court to authorize Bishay to employ Harold Brown and the firm of Brown & Stadfeld as his special counsel to represent him with regard to the Suffolk Court proceedings... 7/31/96 no opposition filed. Allowed.*"[Emphasis added]

6. As part of the Allowed Motion of July 31, 1996, the Special Counsel's Contingent

Fee Agreement, dated July 10, 1996, was incorporated and approved by the

Bankruptcy Court, which is annexed hereto as Exhibit-4, and specifically described

the tasks and authority as follows:

*"Handling the counterclaim against Citizens Bank ("Citizens") in the pending case of Citizens Bank of Massachusetts v. Bahig Bishay et al., Norfolk County Superior Court Docket No. 95-1312 A or any future action filed against Citizens, its employees, representatives, agents, attorneys, officers or directors, successors by the Client arising from the Client's relationship as a borrower of Citizens.*" [Emphasis added]

The approved Fee Agreement empowered the Special Counsel to prosecute all claims existing at that time and at any time thereafter, including this breach of contract claim asserted herein.

7. In 1997, and when Citizens' attorneys stood before the state court judge, they knew

that on March 5, 1996, Citizens had filed the *Second Amended Disclosure Statement*

*Pursuant to Section 1125 of the Bankruptcy Code with respect to the Chapter 11 Plan*

*Proposed by Citizens Bank of Massachusetts,* one year earlier. In this *Amended*

*Disclosure Statement*, copy of which is annexed hereto as Exhibit-5, and in

connection with fully developing the final version of the Plan, Citizens recognized

Bishay's Claims, and described them in its own words as "*One Hundred Million*

*Dollar Claims*" against Citizens.

8

8. In 1997, and when Citizens' attorneys stood before the state court judge, they knew that on March 13, 1996, and in connection with fully developing the final version of the Plan drafted by Citizens, Citizens' V.P., Richard M. Barry wrote to his superiors in his memorandum attached hereto as Exhibit-6, and advised them that in order for Citizens' Proposed Chapter 11 Plan to be approved by the court-appointed Trustee and the Bankruptcy Court, Citizens had to agree to allow Bishay to prosecute his Claims.

9. In 1997, and when Citizens' attorneys stood before the state court judge, they knew that on April 23, 1996, Citizens' attorney, William Baldiga (hereafter "Baldiga"), stood before the Bankruptcy Court and once again confirmed Citizens' knowledge of Bishay's Claims, as reflected in the attached transcript annexed hereto as Exhibit-7, by describing them as "*One Hundred Million, Wide-Ranging Claims*". Baldiga utilized this description to persuade the Bankruptcy Court to order Bishay to set aside in escrow the subject $500,000 (above and beyond the full balance of Bishay's debt) in order to allow Bishay to prosecute his Claims.

10. Based on the foregoing clear and convening evidence, in 1997 Citizens knew (and there can be no room for wiggle here) that the subject agreement/contract clearly identified the parties and the matters to be prosecuted as follows:

a) *Bishay* as the Plaintiff/prosecutor;

b) *Citizens Bank of Massachusetts* as the Defendant; and

c) the *Claims* as those *"arising from the transaction(s) between the Debtors and Citizens Bank and related matters."*

9

11. Accordingly, and pursuant to the authority vested in Bishay and his Special Counsel, on August 27, 1996, Bishay filed his *First Amended Answer, Counterclaim, Third Party Complaint And Jury Demand,* which included additional claims stemming from the bankruptcy proceedings and associated additional damages. Such Amended Counterclaim was consistent with what Citizens described in its *Disclosure Statement* and during the April 23, 1996 oral arguments before the Bankruptcy Court, as Bishay's "*One Hundred Million Dollar, wide-Ranging Claims*", which Citizens relied upon to justify its demand for the additional $500,000 Bishay had to place in escrow.

12. For this Court's edification, also, and to further protect Bishay's right to prosecute his Claims (without limitation) as reflected in the April 23, 1996 Plan/contract, as recent as October 2, 2000, which is annexed hereto as Exhibit-8, the Bankruptcy Court wrote in its *Agreed Order Closing Debtors' Chapter 11 Cases*, the following:

> *"it is further ORDERED that the entry of this Order will have no effect whatsoever on the ability of the Debtors to prosecute <u>any claims against Citizens Bank as set forth in the confirmed Plan,</u> including, but not limited to, litigation currently pending in the state courts."* [Emphasis added]

13. With the above listed facts in mind, which Bishay does not believe Citizens can legitimately dispute, and despite the parties' clear understanding of Bishay's contractual right to prosecute his Claims, Citizens, and specifically Baldiga who stood before the Bankruptcy Court on April 23, 1996, and demanded that Bishay place in escrow $500,000 in order to be able to prosecute his One *Hundred Million Dollar Wide Ranging Claims*, demanded from Bishay's bank the first $360,000 on April 15, 1999, as confirmed in Exhibit-9 annexed hereto. Both Baldiga and

10

Citizens' Vice President Richard Barry (who clearly also knew that the Proposed

Chapter 11 Plan was not going to be approved by the Bankruptcy Court unless

Citizens agreed to let Bishay prosecute his Claims, as reflected in Barry's memo

found in Exhibit-6 herein), unconscionably grabbed Bishay's money after wrongfully

foreclosed Bishay's contractual rights to prosecute his Claims by disingenuously

advancing a res judicata argument in the state court, which Citizens knew then it

fundamentally violated its contractual obligations to Bishay.  Citizens made that

calculated decision to run Bishay out of money, and hoped to someday be able to win

this 10-year battle through the *deep-pocket theory* normally utilized by the *big*

*business* industry -- as it successfully accomplished thus far after Bishay indeed ran

out of the money required to hire more attorneys - and had no choice but to file this

separate breach of contract action, *pro se*.

14. Citizens knew that the only reason Bishay agreed to raise $500,000, and place same

in escrow, was to specifically be able to prosecute his Claims.  To this end, and in

connection with Citizens' novel demand for the additional $500,000, to be set in

escrow by Bishay before he was allowed to prosecute his Claims (which is in and of

itself a stark violation of Bishay's constitutional rights within the 7th and 14th

amendments to the United States Constitution), Baldiga, who had succeeded in

forcing Bishay to set aside these additional funds, published an article in May, 1997

in the *Bankruptcy Strategist* with the heading: *"May a Secured Lender Refuse to*

*Release Its Liens Even After Repayment?"*.  In this article, Baldiga boasted about his

success in forcing Bishay to put up $500,000 before he could prosecute his Claims.

The article states:

11

*"This issue recently arose in an unreported case in the U.S.
Bankruptcy Court for the District of Massachusetts. In the matter
of 1095 Commonwealth Avenue Corp. and Bahig F. Bishay, Nos.
95-15015 and 95-16331 (Bankr. Mass.; hearing of 4/23 and 4/27/
96) (available from the authors). In that case, the court addressed
the lender's request to retain certain of its liens even after full debt
payment pursuant to the Chapter 11 plan proposed by the lender,
where the borrower had previously asserted state court lender
liability claims against the lender. Under the terms of the lender's
plan, the borrower would repay all outstanding principal, interest,
costs and expenses currently due to the lender and, as the
borrower had refused to execute a release of its claims against the
lender, the lender would retain its liens in order to secure payment
of any costs that the lender would later incur defending the
borrower's lender liability claims following confirmation. The
borrower, of course, objected. In confirming the plan, the court
held that, under the terms of the relevant loan documents, the
lenders claim included the lenders future contingent costs in
connection with the debtor's state court claims against the lender.
As a result, in order for the plan to be fair and equitable, the
lender was entitled to retain liens on the debtor's property to
secure those contingent claims in an amount sufficient to cover
such contingent costs (which were estimated at $500,000)."*

15. In sum, and if a res judicata argument was or is even appropriate based on the

circumstances herein, it ought to weigh in Bishay's favor and not Citizens, even now.

In that, and if this Court were to even entertain the appropriate or inappropriate

application of a res judicata argument at this juncture, irrespective of the proposition

advanced by Citizens that some state court judge awarded Citizens $500,000 in a

separate action, and despite Citizens' wrongful foreclosure of Bishay's contractual,

unfettered right to proceed with the prosecution of the Claims – and whereas this

Court appears to have preliminary viewed the state court's award of certain legal fees

in another mater, res judicata in favor of Citizens in this action, and Bishay believes

this is totally misplaced -- Bishay should be allowed to proceed with the prosecution

of his Claims, even now, based on the following analysis:

12

**I.** Supreme Judicial Court Decision in re: *GERALD P. BAGLEY & another v. MICHAEL R. MOXLEY as trustee of the Cliffmont Trust No. 5150 Supreme Judicial Court, Suffolk –* January 8, 1990 June 13, 1990.

In this case, the SJC listed the following distinctions to describe the criterion upon which the Court recognized the intent of the *res judicata* doctrine:

a. Avoiding "*piecemeal*" litigation by precluding litigants from introducing selected causes of action along the way, and until one sticks! This is similar to changing fishing bait until one lures the same fish and at the same pond.

b. Precluding litigants from introducing new causes of action that existed at the time the original action is filed, or those additional actions that could have been brought at the time the original action is filed. When Moxley filed its original action in 1997, Moxley knew it could have advanced its "*adverse possession*" claim, which it later revealed it had since 1957 (forty years earlier), but elected to first test the law by attacking the "*zoning variance*", and if that did not stick, it thought, [incorrectly], it could always go back and start all over again by initiating an *adverse possession* action.

First, Bishay, on the other hand, could not allege a *breach of contract* claim in 1995 & 1996, because such breach was triggered in 1999 (three years later) when Citizens grabbed Bishay's money. In fact, the incubation of this breach began in 1997 when Citizens disingenuously advanced its res judicata argument. The actual consummation, however, took place when Citizens grabbed the first $360,000 in 1999.

Second, Bishay could not have possibly anticipated (in vacuum) that three years from filing the original action, Citizens was going to draw against the $500,000 Letter of Credit in 1999, 2002, and would attempt to draw the balance in 2003. To this end,

13

Bishay had no reason nor the legal standing to bring a *breach or contract* action until one was consummated.

Third, in 1999 Citizens decided to take Bishay's money before it allowed Bishay to enjoy the benefits of his bargain, and drew the first $361,000 in 1999, drew another $70,000 in 2002, and was looking for another $100,000 in 2003 – for a grand total of $530,000 – all without allowing Bishay his day in any court to prosecute his claims on the merits as agreed-to by the parties on April 23, 1996. Thus, by making a conscious decision to draw against the $500,000 Letter of Credit, Citizens knew it was doing so in violation of the specific terms and conditions of the subject "contract".

Fourth, Citizens now argues, and this Court appears to have thus far bought into same, that some court awarded certain legal fees, thus Citizens did nothing wrong. The problem with argument is that there is a line of cases that separate a court order in one proceeding from the action(s) of the parties in another proceeding and/or the parties' respective, contractual obligations in another action. In the subject case, Citizens knew its obligations to Bishay and the "conditions" upon which it was entitled to draw against the $500,000 Letter of Credit. Citizens willingly accepted these conditions in 1996. With that in mind, Citizens made a conscious decision to draw the first $361,000 in 1999, $70,000 in 2002, and launched its final attempt to collect another $100,000 in 2003 – all without meeting the "conditions" upon which the money was set aside. Simply stated, if Citizens wanted to avoid a potential breach of contract claim brought by Bishay, Citizens could have refrained from drawing against the $500,000 Line of Credit in the first place if it did not want to open the door for Bishay to now bring this separate action. This is the calculated risk Citizens clearly contemplated in 1999.

14

**II.** Supreme Judicial Court Decision in re: *CARLA HEACOCK v. GREGG HEACOCK, No N-4623, Supreme Judicial Court, Norfolk* – February 2, 1988 March 22, 1988.

a. The SJC makes specific distinction between the "divorce" action and the "tort" action. Not unlike Bishay's "reservation" claim originally brought in the state court, and his current "breach of contract" claim brought before this Court, which did not exist at the time the "reservation" claim was brought in 1996 – as the breach was not finalized until 1999 when Citizens decided to consummate said breach by grabbing the first $360,000 from Bishay's bank account.

b. Not unlike Citizens and Bishay – the "bankruptcy" proceedings between Bishay and Citizens were not much different from the "divorce" proceedings between Carla and Gregg Heacock – as such proceedings dealt with the distribution of assets and money in both cases, whereas, in the "tort" action of Carla Heacock and Bishay's present breach of contract action, the plaintiffs sought to recover other damages stemming from different actions on the part of the defendants – Gregg Heacock and Citizens Bank in Bishay's case.

c. In the subject case, the facts are even clearer than those in the Heacock case, because in the Heacock case, the "tort" action had been brought prior to the "divorce" action. Whereas, in the Bishay case, the *breach of contract* action did not even exist in 1995/96, and it was not until 1999 that Citizens consummated its breach when it drew the first $360,000 from Bishay's bank account.

d. Bishay could not possibly be perceived to have been a "piecemeal" litigant.

**III.** Eleventh Circuit Court of Appeals' Decision in re: SANDRA L. PLEMING v. UNIVERSAL-RUNDLE CORPORATION, No. 97-8170, United States Court of Appeals, Eleventh Circuit. June 8, 1998.

a. The Court here makes it abundantly clear that "*the doctrine of res judicata does not punish a plaintiff for exercising the option not to supplement the pleading with an after-acquired claim. Id.* at 1360. *We explained that the parties frame the scope of litigation at the time the complaint is filed and that a judgment is only conclusive regarding the matters that the parties might have litigated at that time but not regarding 'new rights acquired, pending the action which might have been, but which were not required to be litigated....'*"

b. The Court went on to say: "*We do not believe that the res judicata preclusion of claims that 'could have been brought' in earlier litigation includes claims which arise after the original pleading is filed in the earlier litigation. Instead, we believe that, for res judicata purposes, claims that 'could have been brought' are claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action.*

c. As in the Bishay vs. Citizens new breach of contract action, this Court said: "*The parties in this case agree that the events giving rise to Pleming II arose well after Pleming filed and amended her complaint in the first lawsuit.* Bishay contends that the events giving rise to his new breach of contract cause of action arose in 1999, and four years after Bishay filed his counterclaim in the first lawsuit in 1995, which Bishay later amended in 1996, but well before Citizens triggered the breach by cashing the first $361,000 in 1999.

d. *Pleming admits that her briefs did refer to these incidents to provide evidence that Universal-Rundle's explanation for hiring someone else in July 1993 was pretextual. The question of whether res judicata bars Pleming's claims, therefore, turns on*

16

*whether the discussion of related but distinct cause of action in briefs amounts to the actual assertion of that claim in the first proceeding.* Bishay contends that the mere fact of mentioning the $500,000 for the purposes of supporting the original "reservation" claim, does not in any way preclude Bishay now from asserting a breach of contract claim, which was triggered in 1999 and involved the same $500,000. The Court said: *" We addressed a similar question in Coon v. Georgia Pacific Corp., 829 F.2d 1563 (11th Cir. 1987), and held that a district court had not abused its discretion by refusing to consider a plaintiff's unpled claims even though the plaintiff had included the claims in her briefs and discovery requests."*

e. The Court also stated: *"As a result, we find that the district court erred when it decided that res judicata barred Pleming's claims of discrimination arising out of the October 1994 incidents…… Much like we held in Wu, this tangential reference to the events of October 1994 was insufficient basis for district court's conclusion that the parties had actually litigated the issue."*

16. Finally, deception, false representation (as described above), concealment, and even lying under oath, is not a new phenomena for Citizens and its attorneys. In 1996, and in connection with the Bankruptcy Court proceedings, which included the submission of fees and costs allegedly incurred by the various creditors, Citizens concealed from Bankruptcy Court a *two-tiered,* dual-billing scheme Citizens and its attorneys had in place, which was designed to bill debtors, such as Bishay, higher fees than those Citizens actually paid to its service-providers, including its attorneys. Upon this sad discovery, the Bankruptcy Court had no choice but to summon Citizens' officers and attorneys to the stand for two consecutive days, because the Bankruptcy Court

17

determined that such concealed arrangements could not be distinguished from

"*fraud*" on the Bankruptcy Court and on Bishay because both the Bankruptcy Court

and Bishay had relied on the various sworn affidavits submitted in the Bankruptcy

Court by Citizens' officers and attorneys, *under the pains and penalties of perjury*, in

connection with the "indemnity" clause found in the loan agreement. The Bankruptcy

Court and Bishay realized that these sworn statements were patently false. After a

two-day evidentiary hearings, where officers and attorneys testified on behalf of

Citizens, and finally admitted that they indeed concealed certain secret arrangements

between them, from Bishay and the Bankruptcy Court, Citizens' attorneys had no

choice by to admit under oath that these secret agreements targeted "solvent"

borrowers, such as Bishay at that time, that had substantial equity in their respective

assets, and that Citizens took advantage of such equity by inflating its *out of pocket*

expenses, by approximately 25% above and beyond what Citizens actually paid to its

professionals. On January 21, 1997, the Bankruptcy Court issued a 41-page Decision,

finding, among other things, that Citizens and its officers and attorneys committed

"*fraud*" on the Court and on Bishay, as they intentionally concealed this "*two tiered*"

dual-billing scheme by filing several false affidavits with the Court. The Bankruptcy

Court sanctioned Citizens and its attorneys in the tune of $200,000. The 41-page

Decision, which is annexed hereto as Exhibit-10, included the following:

*"As a description of the agreements ...These were material terms, whose omission rendered the representations false and quite misleading ... The omission and consequent misrepresentation here are all the more stark and misleading for two reasons...the dual-rate agreement between Citizens and BRF&G is, if not fraudulent, at least deserving of close scrutiny. Had these two entities agreed on one rate and then demanded reimbursement from the Debtor at a higher one, their demand would be unenforceable and, if made*

18

*without disclosure to the Debtor, <u>plainly fraudulent...This is an</u> <u>attempt to couch in legitimacy what is in essence the illegitimate</u> <u>practice of billing the borrower for more than the lender is liable.</u> <u>Where this is done without disclosure of the underlying agreement,</u> <u>and the nondisclosure is intentional, I cannot distinguish if from</u> <u>fraud.</u> The Court concludes that, both by what they actually stated and by what they <u>omitted,</u> the Citizens motion and Barry's <u>supporting affidavit misrepresented</u> the underlying agreement between Citizens and BRF&G and the extent of Citizen's liability thereunder...<u>Barry's   affidavit   contains   two   very   serious</u> <u>misrepresentations...I find that Barry made this misrepresentation</u> <u>intentionally...I</u> also conclude that he made the statement with reckless disregard for the truth of his averments ...The Court concludes that the misrepresentations in Citizens motion and in the supporting affidavit were the result of Citizen's negligence in conducting its inquiry into the underlying fee agreement, but also, in Barry's case, of <u>reckless disregard for the truth,</u> and, to the extent of Mastrovich's involvement in the process, of intent to deceive.  ...F.R. Bankr.P. 9011(a)This case involves two signatures: that of Richard Barry, as representative of Citizens, on the affidavit, and that of Kelly A. McEnaney, for herself, William Baldiga, and BRF&G, all as attorneys for Citizens.  In both cases, <u>the signed documents contained misrepresentations of fact,</u> as have been outlined above.  Both misrepresented the terms of the fee agreement between Citizens and BRF&G; <u>Barry further</u> <u>misrepresented the extent of his knowledge of the agreement and of</u> the fees incurred.  In neither case was the crucial representation formed after reasonable inquiry into the facts. Barry, whose affidavit was submitted as the evidentiary support for the motion, was not familiar with the facts and had conducted no inquiry; and BRF&G's investigation into the facts was inadequate.  In sum, both documents were signed and filed in violation of the rule.. For these reasons, the <u>Court will enter a sanction against Citizens...</u>"*

Bishay reasonably expects this Court to find that based on the clear and convincing

evidence listed herein, and Citizens' repeated *reckless disregard for the truth*, as also

documented in the 41-page Decision annexed hereto as Exhibit-10; Citizens' false representation

to the state court judge in 1997 when it led him to believe that Bishay's Claims had been settled

in the Bankruptcy Court when Citizens clearly knew this was false representation when it made

it; and the wrongful draw of the first $360,000 on April 15, 1999 -- based on this documented

history, if this Court now permits Citizens to reap additional benefits of its reckless disregard for the truth, manifested in these racketeering-like conduct, this would indeed be a travesty of justice.

WHEREFORE, and based on the additional facts articulated herein and the evidence annexed hereto, in addition to those previously included in earlier pleadings, Bishay respectfully requests this Honorable Court to vacate its Order dated October 11, 2005 and deny Citizens' Motion to Dismiss previously filed with this Court; allow Bishay's Breach of Contract Claim; and grant any such other relief this Court deems just and/or appropriate.

Respectfully submitted

BAHIG F. BISHAY,
Pro se

Dated this 25 day of October, 2005

Bahig F. Bishay
163 Blue Hill Drive
Westwood, MA 02090
Phone: 781.326.3310
Fax: 781.326.6690

## CERTIFICATE OF SERVICE

I, Bahig F. Bishay, hereby certify that on this 25th day of October, 2005, I served a true copy of the within Motion, via First Class Mail, pre-paid postage, on Attorney James Stoll of Brown Rudnick, at One Financial Center, Boston, MA 02111.



Bahig Bishay